UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | CRIMINAL NO.: _____ |
| v. | : | |
| | : | Violations: |
| | : | |
| JAMES EDWARD MILLER, | : | 18 U.S.C. § 1956(h) (Conspiracy to |
| | : | Commit Money Laundering) |
| | : | |
| Defendant. | : | 18 U.S.C. § 982(a)(1) (Criminal Forfeiture) |

# I N F O R M A T I O N

The United States Attorney charges:

### Relevant Individuals and Entities

1. The defendant, JAMES EDWARD MILLER ("MILLER"), a resident of Virginia Beach, Virginia, owned and controlled Big Surf Construction Management LLC, also known as Big Surf CM LLC ("Big Surf"). Big Surf was a Virginia limited liability corporation formed on or about November 20, 2007. Big Surf was involved in residential and commercial construction projects. Big Surf maintained an office in Virginia Beach, Virginia.

2. The United States Army Corps of Engineers ("USACE") was a branch of the United States Army. The Headquarters for the USACE was located at 441 G Street, N.W., in the District of Columbia. The Directorate of Contingency Operations ("DCO") was a branch of the USACE. The USACE administered the Technology for Infrastructure, Geospatial, and Environmental Requirements ("TIGER") Contract.

3. The TIGER Contract was a vehicle that authorized federal government agencies and departments used to purchase products and services. The TIGER Contract was an audited and awarded Indefinite Delivery/Indefinite Quantity ("IDIQ") contract. As a result, such authorized

agencies and departments were not required to obtain three separate bids or to compare the TIGER Contract to another contract before submitting an invoice for products and services through the TIGER Contract.

4.   Until October 4, 2011, KERRY F. KHAN ("KHAN") was a Program Manager with the USACE's DCO at Headquarters in Washington, D.C. KHAN was involved in, among other things, placing orders for the DCO through federal government contracts, including the TIGER Contract, and certifying that equipment and services provided through government contracts were received by the USACE.

5.   Eyak Technology, LLC ("EyakTek") was an Alaska Native-owned Small Business and the prime contractor for the TIGER Contract. EyakTek maintained offices in Dulles, Virginia.

6.   Until on or about October 4, 2011, HAROLD F. BABB ("BABB") was the Director of Contracts at EyakTek. BABB was a personal friend of JAMES EDWARD MILLER.

7.   LEE A. KHAN ("LEE KHAN") was the son of KERRY F. KHAN.

8.   Ananke, LLC ("Ananke") was a Virginia limited liability company formed on or about November 14, 2007.

### The Bribery Scheme

9.   In or about April 2008, BABB proposed that MILLER use Big Surf to obtain government contracts awarded by the USACE under the TIGER Contract. BABB explained to MILLER that subcontractors would perform the substantive work on the contracts under Big Surf's supervision. MILLER expected that Big Surf would retain approximately 5% of the contract value to supervise the subcontractors and manage the contracts.

### The First Contract between EyakTek and Big Surf

10. On or about July 15, 2008, BABB sent via e-mail to MILLER a draft Statement of Work ("SOW") for services to be performed by Big Surf in collaboration with the USACE. BABB directed MILLER to put the SOW on Big Surf's letterhead and submit it to EyakTek. The SOW provided that Big Surf would be a subcontractor to EyakTek under the TIGER Contract. The proposed amount to be paid to Big Surf under the SOW was $1,412,315.45. On or about July 16, 2008, BABB informed MILLER via e-mail that the new amount to be paid to Big Surf under the SOW was $1,448,965.45.

11. On or about July 16, 2008, as directed by BABB, MILLER put the draft SOW provided to him by BABB on Big Surf's letterhead, along with the new amount of $1,448,965.45, and submitted the SOW to EyakTek. On or about July 17, 2008, EyakTek issued Purchase Order number PO002927b to Big Surf. The Purchase Order described the services to be performed by Big Surf as follows: "LABOR: Contractor Personnel to support training facilities and networks. Planning layout & Task Management." The "Ship To" address on the Purchase Order for the services was to KHAN's attention at Fort Belvoir, Virginia. The amount of the Purchase Order was $1,448,965.45.

12. To bolster MILLER's qualifications to manage the contracts for the USACE, BABB instructed MILLER to falsely assert in response to due diligence inquiries conducted by EyakTek personnel that MILLER was a retired USACE employee. As instructed, MILLER falsely informed an EyakTek employee inquiring into MILLER's background that MILLER was a retired USACE employee.

13. On or about July 23, 2008, MILLER sent via e-mail to EyakTek an invoice for Purchase Order number PO002927b. The amount of the invoice was $1,448,965.45. Big Surf provided no services to USACE and EyakTek as part of the Purchase Order. BABB and EyakTek approved payment of the invoice.

14. For this project, BABB informed MILLER that Big Surf would supervise the work of Big Surf's subcontractor, Ananke. On or about July 24, 2008, KHAN sent an invoice from Ananke to MILLER, with a copy to BABB. The invoice was in the amount of $1,360,000 and described the services provided by Ananke to Big Surf as follows: "POA&M in powerpoint format for FEAT A/M and PIT PM." MILLER initially understood through discussions with a purported Ananke employee that Ananke had provided services to USACE as part of the Purchase Order.

15. On or about July 25, 2008, EyakTek issued a check to Big Surf for $1,448,965.45.

16. On or about August 12, 2008, BABB instructed MILLER via email to withhold the payment of $160,000 from the $1,360,000 Ananke Purchase Order. On or about August 12, 2008, as directed by BABB, Big Surf wired $1,200,000 to Ananke.

17. For the first contract, Big Surf initially retained $248,965.45. From that amount, BABB directed Big Surf to retain approximately $80,000 and to reserve the remainder for BABB's intended benefit through cash payments and investments in real estate. MILLER knew it was unlawful to provide payments obtained through the contract to BABB.

**The Second Contract between EyakTek and Big Surf**

18. In or about August 2008, MILLER traveled to Northern Virginia to meet with BABB, KHAN, and LEE KHAN. KHAN explained during the meeting that KHAN was an advisor to Ananke, a government contractor that KHAN described as the Khan family business. During the

meeting, KHAN and BABB discussed their five-year plan to make money through government contracts. MILLER understood from the discussion that the first contract between Big Surf and EyakTek was a fictitious contract and that neither Big Surf nor Ananke had provided any services to EyakTek or USACE. MILLER also understood from the discussion that KHAN used KHAN's official position at the USACE to obtain orders for Big Surf and to approve payments from USACE to Big Surf via EyakTek in exchange for payments from Big Surf to KHAN via Ananke. Further, MILLER understood from the discussion that BABB used BABB's position at EyakTek to facilitate the award of orders to Big Surf and to approve payments from EyakTek to Big Surf in exchange for payments from Big Surf directly and indirectly to BABB.

19. On or about September 9, 2008, BABB provided MILLER with a cost and SOW proposal from Big Surf to EyakTek for a project entitled "USACE FEST A/M." The SOW provided that Big Surf would provide three deliverables for a total cost of $3,198,369.92. As directed by BABB, MILLER submitted the SOW to EyakTek for approval.

20. On or about September 9, 2008, EyakTek issued Purchase Order number PO003099a to Big Surf. The Purchase Order described the following services to be performed by Big Surf for the following amounts: "Planning Layout & Task Management" ($1,003,359); "Technical Assessment" ($1,044,179); and "Facility & Infrastructure" ($1,150,831.92). The "Ship To" address on the Purchase Order for the services was to KHAN's attention at the USACE's Headquarters in Washington, D.C. The total amount of the Purchase Order was $3,198,369.92.

21. On or about September 10, 2008, Big Surf submitted an invoice to EyakTek for Purchase Order number PO003099a. The amount of the Purchase Order was $3,198,369.92. Big

Surf provided no services to USACE and EyakTek as part of the Purchase Order. BABB and EyakTek approved payment of the invoice.

22. On or about September 16, 2008, EyakTek issued a check to Big Surf for $3,198,369.92.

23. On or about September 17, 2008, MILLER received via email from an email address associated with KHAN a subcontracting agreement and invoice from Ananke for the project titled USACE FEST A/M. The services to be provided by Ananke to Big Surf were identical to those that Big Surf was to provide to EyakTek under Purchase Order number PO003099a. The total price for the invoice from Ananke to Big Surf was $2,441,309.54.

24. On or about October 8, 2008, as directed by BABB, Big Surf wired $2,441,310.04 to Ananke. MILLER understood that Ananke provided no services to Big Surf, EyakTek, and USACE as part of the Purchase Order and that the payment was intended to benefit KHAN in exchange for KHAN having obtained the order for Big Surf.

25. For the second contract, Big Surf initially retained $757,060. BABB directed approximately $300,000 to Big Surf, approximately $400,000 for real estate investments for the benefit of BABB, and approximately $57,060 to purchase a Porsche for Babb.

### The Third Contract between EyakTek and Big Surf

26. On or about October 6, 2008, BABB provided MILLER with a cost and SOW proposal from Big Surf to EyakTek for a project entitled "USACE FEST A/M." The SOW provided that Big Surf would provide six deliverables for a total cost of $3,393,949.95. On or about October 9, 2008, as directed by BABB, MILLER submitted the SOW to EyakTek for approval.

27. On or about October 10, 2008, EyakTek issued Purchase Order number PO003343c to Big Surf. The Purchase Order described the following services to be performed by Big Surf: "USACE FEST Requirements - Per Attached SOW." The "Ship To" address on the Purchase Order for the services was to KHAN's attention at the USACE's Headquarters in Washington, D.C. The total amount of the Purchase Order was $3,393,949.95.

28. On or about January 13, 2009, Big Surf submitted an invoice to EyakTek for Purchase Order number PO003343c. The amount of the Purchase Order was $3,393,949.95. Big Surf provided no services to USACE and EyakTek as part of the Purchase Order. BABB and EyakTek approved payment of the invoice.

29. On or about January 22, 2009, EyakTek issued a check to Big Surf for $3,393,949.95.

### The Fourth Intended Contract between EyakTek and Big Surf

30. On or about January 8, 2009, BABB provided MILLER with a SOW for a project entitled "Secure Facility Evaluation." On or about January 8, 2008, as directed by BABB, MILLER submitted the SOW to EyakTek for approval. The total cost for the SOW was $1,938,420.

31. On or about January 9, 2009, EyakTek issued Purchase Order number PO003489 to Big Surf. The Purchase Order described the following services to be performed by Big Surf: "Secure Facility Evaluation"; "Documentation"; and "Planning Layout & Task Management." The total amount of the Purchase Order was $1,938,420. Big Surf did not intend to provide any services to USACE and EyakTek as part of the Purchase Order.

### MILLER's Five Year Plan and the Cancellation of the Fourth Intended Contract

32. On or about January 13, 2009, MILLER received an e-mail from BABB informing MILLER that the distribution for the $3,393,949.95 obtained as a result of the third contract between

Big Surf and EyakTek (Purchase Order number PO003343c) was intended to be as follows: $2,942,162.30 for Ananke; $339,395.66 for Big Surf; and $112,392 for "other management." MILLER understood that Ananke provided no services to USACE, EyakTek, and Big Surf, and that the payment was intended to benefit KHAN in exchange for KHAN having obtained the order for Big Surf.

33. On or about January 15, 2009, MILLER sent an e-mail to BABB concerning the distribution for the $3,393,949.95, which stated, among other things, that "Ananke is getting to[o] large of a piece for his contribution" and the distribution should be revised as follows: $2,533,949.95 for Ananke; $400,000 for Big Surf; $60,000 for Big Surf Management; and $400,000 for BABB.

34. On or about February 20, 2009 at 9:18 a.m., MILLER sent an e-mail to BABB concerning the distribution for the $3,393,949.95, which stated, among other things, the following: "I have thought about o[u]r last conversation and I think that 20% is the minimum for the exposure. I understand that you do not like this figure and I also understand that this may end our five year plan, speak with your side and give directions." In the e-mail, MILLER stated the distribution for the $3,393,949.95 should be revised as follows: $2,121,221 for Ananke; $695,759.80 for Big Surf; $60,000 for investment properties; and $500,000 for BABB.

35. On or about February 20, 2009 at 10:25 a.m., BABB sent an e-mail to MILLER concerning the distribution for the $3,393,949.95, which stated, among other things, the following: "We can not do anything different on this one. When I get the program started it has enough overhead built in to up the percentages. We will then have a cash flow and get a higher percentage off of every piece. Call me."

36. On or about February 20, 2009 at 2:45 p.m., BABB sent another e-mail to MILLER concerning the distribution for the $3,393,949.95, which stated, among other things, the following: "You can take my money but do not screw with Kerry he has commitments and need[s] the money now. The basic deal was for 5% and I have been up[p]ing the amount. There are other companies doing for less. So after this one we are both out of it. Just send the money." BABB sent a follow-up e-mail to MILLER on about February 20, 2009 at 2:48 p.m., which stated the following: "When we come back I will bring Kerry down and you can talk with him about any deal going forward. I do not want to be in the middle any more with my butt on the line."

37. On or about February 24, 2009 at 7:14 a.m., KHAN sent an e-mail to BABB and MILLER concerning the distribution for the $3,393,949.95, which stated, among other things, the following: "Please let me know now if James is ok and all is well with him. He is not responding to my phone calls or emails, I don't know if he is ok or not. If there is a problem which it appears to be, let's resolve it now, because this matter is causing serious commitment and obligations problems with the customers['] agreed upon expectations from us. We need to meet the customers['] agreed upon expectations now not later. Please Resolve Now." KHAN sent a follow-up email to MILLER and BABB on or about February 24, 2009 at 7:51 a.m., which stated, among other things, the following concerning the distribution for the $3,393,949.95: "I have vicious pit bulls on my ass and I need to feed them now. We need it today."

38. On or about February 24, 2009 at 8:53 a.m., BABB sent an e-mail to MILLER concerning the distribution for the $3,393,949.95, which stated, among other things, the following: "Kerry said to take your 20% and send the rest to his bank." In the e-mail, BABB stated the

distribution for the $3,393,949.95 would be as follows: $659,759.80 to Big Surf; and $2,698,190.20 to Ananke.

39.   On or about February 24, 2009 at 9:34 a.m., MILLER sent an e-mail to BABB concerning the distribution for the $3,393,949.95, which stated, among other things, the following: "Harold my five year plan started today, I am not sending any monies to anybody. . . . The exposure I have now is too great for 5%, now you guys decide that 20% will work today, you have many other contracts and companies you are sharing with that this small amount will not be missed." As a result, Big Surf retained the $3,393,949.95 and did not pay any of the money, as initially contemplated, to KHAN.

40.   On or about March 2, 2009, at the direction of KHAN and BABB, EyakTek canceled the fourth intended contract between EyakTek and Big Surf (Purchase Order number PO003489).

## COUNT ONE
### (Conspiracy to Commit Money Laundering)

41.   Paragraphs 1 through 40 of this Information are realleged and incorporated by reference as if set out in full.

42.   From in or about April 2008 through in or about March 2009, in the District of Columbia and elsewhere, the defendant, JAMES EDWARD MILLER, did knowingly combine, conspire, and agree with KERRY F. KHAN, HAROLD F. BABB, LEE A. KHAN, and others to commit the following offenses against the United States, in violation of 18 U.S.C. § 1956(h):

   a.   to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activities, that is, bribery of a public official, knowing that the transactions were designed

in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of these specified unlawful activities, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); and

  b. to knowingly engage and attempt to engage, in monetary transactions by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activity, that is, bribery of a public official, in violation of 18 U.S.C. § 1957.

### Goal of the Conspiracy

43. It was a goal of the conspiracy for MILLER and others to unlawfully conduct and cause to be conducted financial transactions in order to conceal from law enforcement and tax authorities the proceeds of their bribery scheme and to unlawfully use proceeds of the bribery scheme to obtain real property, vehicles, and luxury personal goods for their own personal benefit.

### Manner and Means of the Conspiracy

44. In order to achieve a goal of the conspiracy, MILLER and others used the following manner and means, among others:

  a. KHAN, BABB, and MILLER caused Big Surf to submit fictitious purchase orders and invoices to EyakTek to obtain payments from the USACE for government contracts.

  b. In an attempt to surreptitiously receive and hide the receipt of proceeds of the scheme, KHAN, BABB, LEE KHAN, MILLER, and other co-conspirators established and used multiple corporate entities, including shell companies that had no legitimate business purpose, as

well as multiple bank and financial accounts, including accounts held in the names of corporate entities. These bank accounts then received proceeds of the scheme, from cash payments, transfers, and checks from accounts controlled by KHAN, BABB, LEE KHAN, MILLER, and Big Surf. The co-conspirators often moved the proceeds of the scheme through various other bank accounts, which often were held in corporate entities' names, for the purpose of further impeding the tracing of the proceeds by law enforcement and tax authorities.

    c.    MILLER and BABB purchased real property using proceeds of the scheme.

    d.    MILLER and BABB purchased several automobiles with proceeds of the scheme.

    e.    MILLER opened in the name of a shell company an investment account in the Bahamas that MILLER funded with $2,000,000 of proceeds of the scheme.

    f.    MILLER funded an account in Panama with $218,000 of proceeds of the scheme.

**(Conspiracy to Commit Money Laundering, in violation of Title 18, United States Code, Section 1956(h))**

## FORFEITURE ALLEGATION

1.    The allegations set forth in Count One of this Information are re-alleged as though set forth fully herein and incorporated by reference for the purpose of alleging forfeiture to the United States of America pursuant to the provisions of Title 18, United States Code, Section 982(a)(1).

2. As a result of the offense alleged in Count One of this Information, the defendant shall forfeit to the United States any property, real or personal, involved in the offense alleged in Count One, or any property traceable to such property.

3. The property to be forfeited includes, but is not limited to, the following:

**Money Judgment**

$4,055,063, which represents a sum of money constituting, or derived from, proceeds obtained, directly or indirectly, as a result of the offense alleged in Count One of the Information.

**Other Property**

$2,000,000 transferred, on or about March 27, 2009, from Monarch Bank Big Surf Construction Management, LLC, account # XXXXX-4344 to First Caribbean International Bank (Bahamas) account # XXX-3684 held in the name of Alliance Investment Management, Ltd.

$218,000 transferred, on or about April 24, 2009, from Monarch Bank Big Surf Construction Management, LLC, account # XXXXX-4344 to Banco General, S.A. (Panama) account # XX-XX-XX-XXX925-1 held in the name of JP Ventures, Inc.

335 Bobcat Compact Excavator # A16U12012

T190 Compact Track Loader # 531618441

2007 Dodge Ram 3500, VIN 3D6WH46A37G801676

2008 Chevrolet Silverado, VIN 1GCHC23668F109657

2005 Hyundai Tuscon, VIN KM8JM12BX5U098978

Ladies diamond hinged line bracelet set in platinum, Sku # 135-10989, purchased on or about January 23, 2010

Gentlemen's Corum Admiral's Cup Marees Wristwatch, Sku # 617-10750, purchased on or about January 28, 2009

Pair of diamond earrings set in 14-karat white gold three-prong martini style, Sku # 011-10089, purchased on or about January 27, 2009

Diamond engagement ring channel set in platinum Thibaude mounting, Sku # 112-10585 & Sku # 009-10023, purchased on or about January 27, 2009

Men's platinum A. Jaffe diamond band ring, Sku # 117-10463, purchased on or about February 5, 2011

Ladies platinum wideband diamond eternity jewelry, Sku # 190-10311, purchased on or about February 5, 2011

The real property located at 912 S. Oriole Drive, Virginia Beach, VA

**Substitute Property**

All funds contained in HSBC Bank account # XXXXX-0492 held in the name of James Miller

All funds contained in HSBC Bank (Panama) account # XXXXX-1186 held in the name of James Miller

4. By virtue of the commission of the felony offense charged in Count One of this Information, any and all interest that defendant has in any property, real or personal, involved in the offense alleged in Count One, or any property traceable to such property, is vested in the United States and hereby forfeited to the United States pursuant to Title 18, United States Code, Section 982(a)(1).

5. If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

 a. cannot be located upon the exercise of due diligence;

 b. has been transferred or sold to, or deposited with, a third person;

 c. has been placed beyond the jurisdiction of the Court;

 d. has been substantially diminished in value; or

e. has been commingled with other property that cannot be subdivided without difficulty;

it is the intention of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendant up to the value of said property listed above as being subject to forfeiture.

**(Criminal Forfeiture, Title 18, United States Code, Section 982(a)(1)).**

RONALD C. MACHEN JR.
United States Attorney
In and For the District of Columbia

By: _____
MICHAEL K. ATKINSON
D.C. Bar No. 430517
BRYAN SEELEY
D.C. Bar No. 501681
Assistant United States Attorneys
Fraud and Public Corruption Section
555 4th Street, N.W.
Washington, D.C. 20530
202.252.7817 (Atkinson)
202.252.1749 (Seeley)
Michael.Atkinson2@usdoj.gov
Bryan.Seeley@usdoj.gov

DATED: March 12, 2012